No. 26-12533-C

# In the United States Court of Appeals for the Eleventh Circuit

STATE OF FLORIDA, ET AL.,
*Plaintiffs-Appellees*,

v.

LEAGUE OF WOMEN VOTERS, ET AL.
*Intervenors-Defendants-Appellants*.

## APPELLEES' JURISDICTIONAL RESPONSE

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
NO. 3:24-CV-509

JAMES UTHMEIER
*Attorney General*

RYAN NEWMAN
Chief Deputy Attorney General

Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399
*christopher.baum@myfloridalegal.com*

*Additional counsel listed on signature page*

DAVID M.S. DEWHIRST
*Solicitor General*

JASON J. MUEHLHOFF
*Chief Deputy Solicitor General*

CHRISTOPHER J. BAUM, B.C.S.
*Senior Deputy Solicitor General*

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Counsel for Plaintiffs-Appellees hereby incorporates Intervenors-Defendants-Appellants' CIP included with their August 7, 2026 Appellants' Brief, as well as the CIP filed by Plaintiffs-Appellees on August 18, 2026. Plaintiffs-Appellees are not aware of any additional interested persons.

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

*/s/ Christopher J. Baum*
Christopher J. Baum
*Counsel for Plaintiffs-Appellees*
*State of Florida and the Florida*
*Department of State*

## TABLE OF CONTENTS


CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........ 1

TABLE OF CONTENTS ........ ii

TABLE OF CITATIONS ........ iii

INTRODUCTION ........ 1

BACKGROUND ........ 2

A. Plaintiffs' lawsuit. ........ 2

B. The parties execute a settlement agreement and the Court approves it. ........ 4

C. Another district court issues an order vacating the modified SAVE system. ........ 5

D. Defendants disable functions of the SAVE system that are guaranteed by the settlement agreement. ........ 7

E. The district court grants Plaintiffs' emergency motion to enforce the settlement agreement. ........ 7

F. LWV and EPIC intervene. ........ 9

G. LWV appeals. ........ 9

STANDARD OF REVIEW ........ 10

ARGUMENT ........ 10

INTERVENORS LACK STANDING TO APPEAL THE DISTRICT COURT'S ENFORCEMENT ORDER. ........ 10

A. Intervenors' authority does not support standing. ........ 11

B. Even if the Court could look to Intervenors' evidence in the *LWV* case, Intervenors' asserted injuries there do not establish standing here. ........ 17

CERTIFICATE OF COMPLIANCE ........ 35

CERTIFICATE OF SERVICE ........ 36

# TABLE OF CITATIONS

**Page(s)**

**Cases**

*AFGE v. Department of Hous. & Urb. Dev.*,
118 F.3d 786 (D.C. Cir. 1997).....18

*Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*,
No. 25-cv-339, 2026 WL 879518 (D.D.C. Mar. 31, 2026).....21

*Am. Fed'n of State, Cty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*,
172 F.4th 361 (4th Cir. 2026).....21

*Arcia v. Fla. Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014).....30

*Arizonans for Off. Eng. v. Arizona*,
520 U.S. 43 (1997).....15

*Bird v. Mayorkas*,
4:24-cv-423 (S.D. Iowa Dec. 3, 2024).....3

*Haynes v. McCalla Raymer, LLC*,
793 F.3d 1246 (11th Cir. 2015).....16

*Cendan v. Sch. Bd. of Broward Cty., Fla.*,
628 F. Supp. 3d 1191 (S.D. Fla. 2022).....26

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983).....18

*Cox Cable Commc'ns, Inc. v. United States*,
992 F.2d 1178 (11th Cir. 1993).....11

*Dep't of Com. v. New York*,
588 U.S. 752 (2019).....28

*Diamond Alt. Energy, LLC v. EPA*,
606 U.S. 100 (2025).....28

*Diamond v. Charles*,
476 U.S. 54 (1986).....15

*Diaz v. Miami-Dade Cty.*,
424 F. Supp. 3d 1345 (S.D. Fla. 2019).....26

*Doe ex rel. Doe v. Sch. Bd. For Santa Rosa Cty.*,
711 F. Supp. 2d 1325 (N.D. Fla. 2010) ........................................ 12, 13

*Drazen v. Pinto*,
74 F.4th 1336 (11th Cir. 2023) ........................................ 20, 23, 26

*Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*,
48 F.4th 1236 (11th Cir. 2022) ........................................ 20

*Indiana v. U.S. Dep't of Homeland Sec.*,
No. 1:25-cv-0732 (S.D. Ind. Apr. 16, 2025) ........................................ 3

*League of Women Voters v. U.S. Dep't of Homeland Sec'y*,
835 F. Supp. 3d 79 (D.D.C. 2026) ........................................ 7, 23, 28, 30

*League of Women Voters v. U.S. Dep't of Homeland Sec'y*,
No. 25-cv-3501 (D.D.C. April 2, 2026) ........................................ passim

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........................................ 16

*Mack v. Delta Air Lines, Inc.*,
639 F. App'x 582 (11th Cir. 2016) ........................................ 27

*Martin v. Wilks*,
490 U.S. 755 (1989) ........................................ 11

*McIntyre v. Delhaize Am., Inc.*,
403 F. App'x 448 (11th Cir. 2010) ........................................ 17

*Muransky v. Godiva Chocolatier, Inc.*,
979 F.3d 917 (11th Cir. 2020) ........................................ 24

*Salazar v. Buono*,
559 U.S. 700 (2010) ........................................ 12, 14, 17

*Shahar v. Bowers*,
120 F.3d 211 (11th Cir. 1997) ........................................ 17

*State of Florida v. Dep't of Homeland Sec'y*,
No. 3:24-cv-509 (N.D. Fla. Nov. 4, 2024) ........................................ 3

*State of Ohio v. Dep't of Homeland Sec'y*,
No. 3:24-cv-283 (S.D. Ohio Oct. 24, 2024) ........................................ 3

*Taylor v. Polhill*,
964 F.3d 975 (11th Cir. 2020) ........................................ 10

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 19, 26, 27

*Virginia House of Delegates v. Bethune-Hill*,
587 U.S. 658 (2019) .......... 11

*Washington v. Miami-Dade Cty.*,
No. 19-cv-20092, 2019 WL 7049931
(S.D. Fla. Dec. 23, 2019) .......... 25, 26, 27

**Statutes**

§ 98.075, Fla. Stat. .......... 3

8 U.S.C. § 1373 .......... 3

8 U.S.C. § 1644 .......... 3

Ind. Code § 3-7-38.2-7.3 .......... 3

Ind. Code § 3-7-26.3-10 .......... 3

Ind. Code § 3-7-26.3-16 .......... 3

Iowa Code § 47.1 .......... 3

Iowa Code § 47.7 .......... 3

Iowa Code § 39A.7 .......... 3

Ohio Rev. Code § 3501.04 .......... 3

**Regulations**

Notice of a Modified System of Records, 90 Fed. Reg. 48,948 .......... 5

Notice of a Modified System of Records, 90 Fed. Reg. 50,879 .......... 5

## APPELLEES' JURISDICTIONAL RESPONSE

Plaintiffs (several states and state officials) entered into a settlement agreement with the Department of Homeland Security requiring DHS to maintain certain features of the Systematic Alien Verification for Entitlements (SAVE) system that are critical tools for Plaintiffs in ensuring the integrity of their elections. The district court approved that agreement, incorporated it into its dismissal order, and retained jurisdiction to enforce it. When DHS breached the settlement agreement, Plaintiffs moved to enforce it, and the district court granted that motion. DHS did not appeal.

Non-parties LWV and EPIC intervened for the sole purpose of appealing the district court's enforcement order. But because DHS did not appeal, Intervenors must independently demonstrate standing. This they cannot do. After all, the settlement agreement imposes obligations and duties only on the parties, not Intervenors.

Intervenors insist, however, that they have standing based on a judgment in another case—not involving the settlement agreement—purportedly requiring DHS to breach its obligations to Plaintiffs. But Intervenors have identified no authority for the proposition that they

have standing to appeal a post-judgment order in *this* case simply because their judgment in *that* case might be affected.

More to the point, Intervenors must establish each element of standing, either with allegations or actual evidence. Intervenors have not made any allegations in this case (because they failed to file an answer with their intervention motion, *contra* Fed. R. Civ. P. 24(c)), and they have produced no evidence at all, as the district court recognized. For that reason alone, they do not have standing to appeal.

But even if Intervenors could somehow import their allegations or evidence from the case in which they obtained a judgment, they lack standing in that case, too. Their claimed "privacy," "reputational," and "voting" injuries are insufficiently concrete, and the only concrete harms they alleged there are only traceable to and redressable by States, not the federal defendants there.

The Court should dismiss the appeal for lack of standing.

## BACKGROUND

### A. Plaintiffs' lawsuit.

This case involves Plaintiffs' (Florida, the Florida Department of State, Ohio, the Ohio Secretary of State, the Attorney General of Iowa, the Secretary of State of Iowa, Indiana, and the Indiana Secretary of

State) obligations to maintain accurate and current voter registration records to prevent voter fraud, including non-citizen voting. *See* § 98.075(1), Fla. Stat.; Ohio Rev. Code § 3501.04; Iowa Code §§ 47.1, 47.7, 39A.7; Ind. Code §§ 3-7-26.3-10 & 16; Ind. Code § 3-7-38.2-7.3. The federal government likewise has a duty to cooperate with States in ensuring that only citizens vote in their elections. *See* 8 U.S.C. § 1373(c); 8 U.S.C. § 1644.

Because the federal government had been refusing to comply with this obligation and had frustrated Plaintiffs' ability to maintain the integrity of their elections, the Florida Plaintiffs sued the Department of Homeland Security and the Secretary of the Department of Homeland Security in November 2024. *State of Florida v. Dep't of Homeland Sec'y*, No. 3:24-cv-509, ECF 6 (N.D. Fla. Nov. 4, 2024).[1] In the amended complaint, Plaintiffs sought an order holding unlawful Defendants' failure to provide Plaintiffs with the required response to their inquiries

[1] The remaining Plaintiff States also filed several separate lawsuits in their respective local jurisdictions, beginning in October 2024. *State of Ohio v. Dep't of Homeland Sec'y*, No. 3:24-cv-283, ECF 1 (S.D. Ohio Oct. 24, 2024); *Bird v. Mayorkas*, 4:24-cv-423, ECF 1 (S.D. Iowa Dec. 3, 2024); *Indiana v. U.S. Dep't of Homeland Sec.*, No. 1:25-cv-0732, ECF 1 (S.D. Ind. Apr. 16, 2025).

to verify or determine the citizenship or immigration status of individuals within their jurisdiction for a purpose authorized by law; a declaration that Plaintiffs are entitled to the required response to their inquiries; and permanent injunctive relief, or the issuance of a writ of mandamus, ordering Defendants to adequately respond to the inquiries made by Plaintiffs. ECF 29, at 24.

### B. The parties execute a settlement agreement and the Court approves it.

In November 2025, the parties executed a settlement agreement resolving all of Plaintiffs' claims. ECF 30-1. In exchange for Plaintiffs' release and dismissal of their claims, Defendants agreed—among other things—to ensure that the Systematic Alien Verification for Entitlements (SAVE) system had the capability to (1) "[i]ntegrat[e] with the Social Security Administration to allow searches with full [SSNs] to be used as a non-DHS enumerator"; (2) "[i]ntegrat[e] with the Social Security Administration to allow searches with last-four-digits SSNs to be used as a non-DHS enumerator"; and (3) "process bulk upload verification requests so that users of the system will not need to input verification requests one-by-one." ECF 30-1, at 4–5.

Relying on Defendants' guarantees in the settlement agreement, Plaintiffs moved to dismiss with prejudice under Federal Rule of Civil Procedure 41(a)(2).[2] The district court granted that motion. ECF 31. The district court retained jurisdiction over the case for the purpose of enforcing the settlement agreement. ECF 31, at 1–2.

From December 2025 to June 2026, Plaintiffs and Defendants performed their duties and obligations under the settlement agreement. As relevant here, Defendants ensured that the SAVE system had a bulk upload function and was searchable via Social Security Numbers and last-four-digits Social Security Numbers. *See* ECF 32-1, ¶ 5.

### C. Another district court issues an order vacating the modified SAVE system.

In late 2025, DHS and the Social Security Administration published System of Records Notices (SORNs) for the modifications made to their systems that allowed for the changed functionality of the SAVE system. Notice of a Modified System of Records, 90 Fed. Reg. 48,948; Notice of a Modified System of Records, 90 Fed. Reg. 50,879.

[2] In further reliance on Defendants' guarantees, the Plaintiff States also moved to dismiss their separate lawsuits that were pending in federal courts in Ohio, Iowa, and Indiana.

A group of plaintiffs, including the League of Women Voters and the Electronic Privacy Information Center (collectively, LWV), challenged the modifications made to the SAVE system outlined in those SORNs in the U.S. District Court for the District of Columbia. The federal government defended the modifications to the SAVE program in its briefing, noting those changes were "as required by the judicially enforceable settlement agreement in Florida." *See League of Women Voters v. U.S. Dep't of Homeland Sec'y*, No. 25-cv-3501, ECF 77-1, at 63 (D.D.C. April 2, 2026). Given the prior-in-time binding order, DHS in that case argued that "principles of equity and comity also require the Court not to enter relief that would subject the United States to conflicting court orders." *Id.* at 62.

U.S. District Judge Sparkle L. Sooknanan ignored those concerns. More than six months after the settlement and order from the district court below, on June 22, 2026, Judge Sooknanan granted the *LWV* plaintiffs' motion for summary judgment and held that the modified SAVE system violated the Social Security Act and the Privacy Act of 1974 and that its establishment was arbitrary and capricious under the Administrative Procedure Act. *League of Women Voters v. U.S. Dep't of*

*Homeland Sec'y*, 835 F. Supp. 3d 79, 119–20, 130 (D.D.C. 2026). As a result, Judge Sooknanan issued an order "set[ting] asid[e] and vacat[ing] the SAVE 'modified system" and the related SORNs. *Id.* at 138.

The federal government appealed and moved to stay pending appeal, but Judge Sooknanan denied the motion to stay pending appeal. *League of Women Voters*, No. 25-cv-3501, ECF 123, 124 (D.D.C. July 8, 2026). The federal government renewed its motion for a stay in the D.C. Circuit, and the D.C. Circuit denied the motion. The federal government's application for a stay is currently pending in the Supreme Court. *Dep't of Homeland Sec. v. League of Women Voters*, No. 26A308 (U.S.).

### D. Defendants disable functions of the SAVE system that are guaranteed by the settlement agreement.

Sometime around June 24, 2026, Defendants disabled the bulk upload function in SAVE. ECF 32-1, ¶ 5. Defendants also disabled the ability for States to search the database with Social Security Numbers or last-four-digit Social Security Numbers. ECF 32-1, ¶ 5.

### E. The district court grants Plaintiffs' emergency motion to enforce the settlement agreement.

After Defendants took the position that Judge Sooknanan's order bound DHS notwithstanding the district court's order below

incorporating and enforcing the settlement agreement, Plaintiffs promptly moved to enforce the settlement agreement. ECF 32. LWV filed an amicus brief in opposition to Plaintiffs' motion. ECF 37-1.

The district court granted Plaintiffs' motion, holding that "Defendants are plainly in violation of the settlement agreement," and explaining that "[t]he fact that Defendants disabled those features to comply with Judge Sooknanan's order does not change the fact that they violated the agreement." ECF 45, at 5. That Judge Sooknanan concluded that the modifications to SAVE were inconsistent with federal law also did not "somehow undo" the district court's "implicit determination" to the contrary when it approved the settlement agreement. ECF 45, at 6. After all, the district court "is not bound by Judge Sooknanan's order," and "the [district court] disagree[d] with the conclusions in that order." ECF 45, at 7. In granting Plaintiffs' motion, the district court ordered Defendants to "immediately comply" with the settlement agreement "by reinstating Plaintiffs' access to the bulk-upload and SSN-search features in the SAVE system." ECF 45, at 9–10. As a result, the Plaintiff States are currently the only States in the country able to use modified SAVE.

### F. LWV and EPIC intervene.

The next day, LWV moved to intervene to "defend their interests in the Eleventh Circuit by filing a notice of appeal." ECF 48, at 2. While that motion was pending, the parties filed a joint status report detailing Defendants' efforts to comply with the settlement agreement. ECF 53, at 2. The district court then granted LWV's intervention motion. ECF 54. In so doing, the district court reaffirmed that the modifications to the SAVE system are lawful. *Id.* at 4 n.2.

The district court also noted Plaintiffs' argument that LWV did not demonstrate standing to appeal. ECF 54, at 10. But, in the court's view, that argument went "more to the question of whether the Eleventh Circuit should dismiss the appeal once [LWV] files it than the threshold question of whether" LWV should be allowed to intervene. ECF 54, at 11.

### G. LWV appeals.

This appeal followed. After Intervenors filed their initial brief, the Court issued the following jurisdictional question:

> Please address whether appellants have standing to appeal the district court's July 7, 2026, enforcement order. *See Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1353-54 (11th Cir. 2003) (explaining that litigants must establish their standing to appeal, and that only a litigant who is aggrieved by the

relevant judgment or order may appeal it); *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019) ("[T]o appeal a decision that the primary party does not challenge, an intervenor must independently demonstrate standing."); *Salazar v. Buono*, 559 U.S. 700, 712 (2010) (plurality opinion) ("A party that obtains a judgment in its favor acquires a 'judicially cognizable' interest in ensuring compliance with that judgment." (quoting *Allen v. Wright*, 468 U.S. 737, 763 (1984)). *But see Martin v. Wilks*, 490 U.S. 755, 762 (1989) ("A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings.").

## STANDARD OF REVIEW

"Standing is a jurisdictional issue that [this Court] review[s] de novo." *Taylor v. Polhill*, 964 F.3d 975, 980 (11th Cir. 2020).

## ARGUMENT

**INTERVENORS LACK STANDING TO APPEAL THE DISTRICT COURT'S ENFORCEMENT ORDER.**

In their initial brief, Intervenors dedicated less than a page to arguing that they have standing to "defend the judgment they secured in *LWV*." Init. Br. 25. Intervenors are appealing the enforcement order, which purportedly affects their interests "based on the relief they obtained—rightly or wrongly—in the D.D.C. case." ECF 54 at 7. ECF 54 at 11. This argument fails multiple times over.

### A. Intervenors' authority does not support standing.

Intervenors' claim to standing ignores one basic problem: Defendants did not appeal the enforcement order. "[T]o appeal a decision that the primary party does not challenge, an intervenor must independently demonstrate standing." *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019); *see Cox Cable Commc'ns, Inc. v. United States*, 992 F.2d 1178, 1181 (11th Cir. 1993) ("It is well-settled . . . that when an intervenor appeals and the party on whose side he intervened does not, the intervenor must demonstrate standing in order to continue the suit.").

Intervenors lack standing to enforce (or avoid enforcement of) the settlement agreement. It imposes obligations and duties only on the parties to it—none of which are Intervenors. *See Martin v. Wilks*, 490 U.S. 755, 762 (1989) ("A judgment or decree among parties to a lawsuit resolves issues as among them," and "it does not conclude the rights of strangers to those proceedings."). Intervenors have no rights under the settlement agreement; they were not parties to the negotiations; and they have no legally protectable interest in whether or how that agreement is enforced. *See* ECF 30-1, ¶ 16 ("This Settlement Agreement is not

intended to create, and does not create, any third-party beneficiary rights or any other kind of right or privilege for any person, group, or entity.”).

Intervenors insist nonetheless that they have a legally protectable interest in the relief they obtained in the *LWV* vacatur decision and that enforcing the settlement agreement impairs that interest. Init. Br. 25–26. In support, they relied in their initial brief solely on *Salazar v. Buono*, 559 U.S. 700, 712 (2010) (plurality opinion of Kennedy, J., joined by Roberts, C.J., and Alito, J., in part), in which the three-justice plurality stated that “[a] party that obtains a judgment in its favor acquires a ‘judicially cognizable’ interest in ensuring compliance with that judgment.”

Intervenors, however, stretch *Salazar* well past the breaking point. There, an individual (Buono) had obtained a permanent injunction forbidding the federal government from displaying a cross on certain federal land. *Id.* at 710. Congress then passed a land-transfer statute directing the Secretary of the Interior to transfer the government’s interest in the land on which the cross sat to a private party. *Id.* at 709–10. Buono returned to the *same* district court and sought injunctive relief against the transfer, arguing that it was a sham aimed at keeping the

cross in place. *Id.* at 701. He thus sought "to prevent the Government from frustrating or evading th[e previous] injunction." *Id.* at 713.

The point on which "[a]ll nine Justices [in *Salazar*] appear[ed] to agree" was "that in a post-judgment proceeding, an original party has standing to vindicate or compel compliance with a final judgment in his favor." *Doe ex rel. Doe v. Sch. Bd. For Santa Rosa Cty.*, 711 F. Supp. 2d 1325, 1328 n.8 (N.D. Fla. 2010). The justices all apparently agreed that Buono had standing to return to the *same* district court that issued the injunction to compel compliance with that injunction. *See id.*

*Salazar* is a far cry from this case. Here, Intervenors are not an original party to this action. Nor do they have a final judgment in their favor in this action. Nor have they obtained an injunction from the district court below. Nor, indeed, have they even obtained an injunction from the D.C. District Court that they seek to enforce. All that *Salazar* means for this case is that *Plaintiffs*—here the States—have standing, after the district court dismissed the case and adopted the parties' settlement agreement, to return to the district court and compel compliance with that agreement—the very thing Intervenors are trying to prevent. *E.g.*, *Santa Rosa Cty.*, 711 F. Supp. 2d at 1328 (relying on

*Salazar* and holding that original parties to consent decree had standing to resist intervention "to preserve the benefit of their bargain").

*Salazar* does not stand for the proposition that Intervenors, who obtained a judgment—but not an injunction—in a different district court have standing to appeal a post-judgment order in *this* case to vindicate their interest in *that* case. In fact, it stands for the opposite. Unlike *Salazar*, this is "a case in which a party seeks to import a previous standing determination into a wholly different dispute." 559 U.S. at 713. Intervenors have standing under *Salazar* to return to the D.C. District Court and request that it compel compliance with the final judgment in *that* case (and indeed they have done so, *see League of Women Voters*, No. 25-cv-3501, ECF 128 (D.D.C. July 14, 2026) (motion to enforce summary judgment order)), but they lack standing to come to *this* Court to seek to prevent the enforcement of a settlement agreement to which they are not parties in a wholly separate case when Defendants have not appealed.

So it is unsurprising that Intervenors did not cite even a single case in their initial brief relying on the three-justice plurality's statement in *Salazar* as they do. That's because none exists. Courts have relied on it to establish that an original party has standing to enforce a judgment in

the same action. But so far as Plaintiffs are aware, no court has ever relied on it to establish that an intervenor has standing to appeal the enforcement of a judgment to which they are a nonparty (which no original party appeals) simply because they obtained a different judgment in another case that might be affected.[3]

As a result, contrary to Intervenors' claim, the Court must indeed consider Intervenors' purported "injuries resulting from reinstating the SAVE modifications"—i.e., from the district court's enforcement order. Init. Br. 26 n.5; *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 65 (1997) ("[a]n intervenor cannot step into the shoes of the original party unless the intervenor independently fulfills the requirements of Article III" (quotation omitted)). The problem is that Intervenors haven't identified any injuries other than the effect on the *LWV* judgment, which as discussed does not give them standing.

[3] Compounding errors, Intervenors also appear to be mistaking the level of interest required to intervene under Rule 24 with Article III standing. *See Diamond v. Charles*, 476 U.S. 54, 68 (1986) (a party's status as an intervenor below "does not confer standing sufficient to keep the case alive in the absence of the [aligned party] on . . . appeal"). That is why in describing the purported harm they would suffer absent reversal, Intervenors quoted only the portion of the district court's order addressing whether they had an interest sufficient to support *intervention*, not standing. Init. Br. 26 (quoting ECF 54, at 7).

Critically, Intervenors did not allege any facts that, if true, would support standing; they chose not to file an answer with their intervention motion, despite Federal Rule of Civil Procedure 24(c), so they have alleged *no* facts in this case. ECF 48, at 2 n.1. And as the district court recognized, “there is *no evidence* before this Court demonstrating that [LWV] would have had standing to intervene in this case to oppose Plaintiffs’ efforts to obtain enhancements to the SAVE system or to challenge the terms of the consent decree (before or after it was entered).” ECF 54, at 11 (emphasis added).

That is, Intervenors have not alleged any facts nor produced a shred of evidence, let alone any establishing that they would suffer any “privacy,” “reputational,” or “voting” injury from the district court’s enforcement order that is sufficiently concrete and certain to satisfy Article III. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (A plaintiff must support “each element” of standing with “the manner and degree of evidence required at the successive stages of the litigation.”). That is why, in their brief, they reference only the *LWV* decision rather than any allegations or evidence in this case. *See* Init. Br. 26 n.5. *But see Haynes v. McCalla Raymer, LLC*, 793 F.3d 1246, 1250 (11th Cir. 2015)

(explaining that the Court "will not consider any arguments a party attempts to incorporate by reference to filings in the district court").[4] Their decision comes at a cost: Intervenors failed to demonstrate standing, and this Court should dismiss the appeal on that basis alone.

### B. Even if the Court could look to Intervenors' evidence in the *LWV* case, Intervenors' asserted injuries there do not establish standing here.

The Court's inquiry should end there. But even if the Court could somehow rely on the evidence Intervenors produced in the *LWV* case, *but see Salazar*, 559 U.S. at 713 (explaining that *Salazar* was not "a case in which a party seeks to import a previous standing determination into a wholly different dispute"), Intervenors' asserted injuries still do not support standing. Intervenors claimed there that they have members "who will be harmed by DHS and SSA providing Plaintiffs access to the modified SAVE system and the unreliable citizenship data it incorporates." Init. Br. 26 n.5. But their claimed "privacy," "reputational," and "voting" injuries, *id.*, are insufficiently concrete, and

---

[4] And Intervenors cannot now supplement the record with new evidence in response to the Court's Jurisdictional Question. *See McIntyre v. Delhaize Am., Inc.*, 403 F. App'x 448, 451 (11th Cir. 2010) (citing *Shahar v. Bowers*, 120 F.3d 211, 212 (11th Cir. 1997)).

the only concrete harms alleged are only traceable to and redressable by non-party States, not the federal Defendants there.

1. *Intervenors' alleged "privacy" and "reputational" injuries lack concreteness and similarity to common-law torts.*

Intervenors' asserted privacy and reputational injuries are insufficiently concrete to support standing. They alleged in *LWV* that their members "reasonably fear and are emotionally distressed by the unauthorized inter-governmental disclosure, aggregation, misuse, and potential mishandling of their sensitive personal data" in violation of the Privacy Act. *League of Women Voters v. U.S. Dep't of Homeland Sec'y*, No. 25-cv-3501, ECF 61, ¶¶ 158–59 (D.D.C. Jan. 21, 2026). But the "emotional consequences" of government action "simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983).

The disclosures here of which Intervenors complained, moreover, are intra-governmental, not public, so Intervenors' asserted privacy interests do not support standing. "[T]he individual interest in protecting the privacy of the information sought by the government is significantly less important where the information is collected by the government but not disseminated publicly." *AFGE v. Department of Hous. & Urb. Dev.*,

118 F.3d 786, 793 (D.C. Cir. 1997). A voter's full SSN is disclosed only from SSA, which is not a party to this case, to DHS, and only when the user has supplied a partial SSN. The only information shared outside the federal government, the information returned to the SAVE user, is limited to confirmation of citizenship and whether the individual is deceased. Plus, it can be used only for limited purposes and the user must safeguard it. These disclosures do not cause the type of injury that "history and tradition" indicate is sufficient to confer standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021).

Specifically, the disclosures at issue are not analogous to the common law torts of "intrusion upon seclusion, breach of confidence, and defamation" that Intervenors analogized to in *LWV*. *League of Women Voters*, 835 F. Supp. 3d 79, 107–12 (D.D.C. 2026). Intervenors are required to make such an analogy because, even though they claim their alleged privacy and reputational injuries result from statutory violations, *id.* at *11, Article III still requires that they demonstrate the concreteness of their alleged injuries by "identif[ying] a close historical or common-law analogue for" them. *TransUnion LLC*, 594 U.S. at 424. The "relationship between the harms" involved in this inquiry "is too

attenuated when a plaintiff completely fails to allege an element essential to the harm set out as a common-law comparator" or when the harms don't "share a close relationship in kind" as opposed to "degree." *Drazen v. Pinto*, 74 F.4th 1336, 1343 (11th Cir. 2023) (quotations omitted).

*First*, Intervenors' claimed privacy and reputational harms to their members are too unlike the harms redressable by an action for intrusion upon seclusion to support standing. "Intrusion upon seclusion consists of an (i) intentional intrusion (ii) into another's solitude or seclusion, (iii) which would be highly offensive to a reasonable person." *Id.* at 1345 (citations omitted). The first two elements require a trespass "in a realm that is private and personal." *Id.* at 1339, 1345 (quotation omitted).

These requirements led this Court to "suggest[] that the tort of intrusion upon seclusion addressed only invasions of privacy like eavesdropping and spying, which pose a different kind of harm altogether," *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1266 n.7 (11th Cir. 2022) (en banc) (Newsom, J., dissenting) (quotation omitted), from the alleged harm of a federal entity sharing whether an individual is alive and whether SAVE has confirmed the

individual's citizenship with a state governmental entity. Unlike spying and eavesdropping, this is not open-ended snooping. It therefore cannot result in discovery of embarrassing personal information. Also dissimilar to spying and eavesdropping, use of the information discovered is strictly limited; it cannot be spread further or used to gain unfair advantage over its owner. The harms alleged here are therefore different in kind from those that constitute intrusion upon seclusion.[5]

In terms of the tort's elements, there is no intrusion by Defendants, physical or otherwise. Operation of SAVE does not collect any information from any individual either covertly or overtly. The user State provides information to DHS, which then provides information to

[5] The cases that the *LWV* court cited for its acceptance of Intervenors' intrusion upon seclusion analogy, to the extent that they are persuasive at all, only reinforce that the alleged harm here is different in kind from that which the tort recognizes. *See League of Women Voters*, 835 F. Supp. 3d at 109–11. Those cases were about "DOGE's large-scale prying," and those courts concluded that the harms alleged were "[m]uch like rifling through someone's wallet, bank account, or personal documents." *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*, No. 25-cv-339, 2026 WL 879518, at *10 (D.D.C. Mar. 31, 2026); *Am. Fed'n of State, Cty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 172 F.4th 361, 368–69 (4th Cir. 2026). Defendants' disclosure through SAVE of two non-personally identifiable pieces of information for strictly limited purposes is different in kind from such open-ended, wide-sweeping searching for anything that might prove inefficient.

the user State. Defendants' participation in this process never even disturbs the subjects of SAVE inquiries because individuals never become aware that they have been subjects of an inquiry unless a different party—the State SAVE user—takes further independent action based on the inquiry's results. Thus, Defendants commit no intrusion.

Additionally, neither confirmation of citizenship nor deceased status is a matter of solitude or seclusion. Citizenship status has meaning only in a public context. Whether one is deceased is a similarly public matter, as evidenced by the countless deaths reported every day in public newspaper obituaries.

Finally, a reasonable person would not find SAVE's limited disclosures highly offensive either. Stating one's citizenship status is not offensive, even if the statement is inaccurate, because that status, in itself, says nothing about one's personal character, value, or affairs. Again, SAVE does not assert that any individual is not a citizen. So even if, assuming for the sake of argument, that might be highly offensive to a reasonable person, it wouldn't matter for this case. Reporting whether an individual is deceased is not highly offensive either. Neither

Intervenors nor the *LWV* court argued that it would be. *See League of Women Voters*, 835 F. Supp. 3d at 108–11.[6]

So Intervenors fail to allege intrusion, solitude or seclusion, and highly offensiveness—all three elements of intrusion upon seclusion. Because of this, and because the harms alleged here are different in kind from those that traditionally constitute intrusion upon seclusion, Intervenors' analogy to this tort does not support standing. *See Drazen*, 74 F.4th at 1343.

*Second*, analogy to the tort of breach of confidence also fails. To begin, this Court has expressed doubt "whether breach of confidence is sufficiently ancient" to support standing by analogy because it "was emerging" only "in the 1980s" "after initially dying out in its infancy." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931 (11th Cir. 2020) (quotations omitted). The Court would be breaking new ground were it

---

[6] Because SSA is not a party to this case, whether its conduct could support standing in a case against it is irrelevant. But for the sake of completeness, a reasonable person would not be highly offended by SSA's sharing of information through SAVE. SSA only supplements for DHS a partial Social Security Number supplied by a State, and even then, DHS must keep it secret. Neither Intervenors nor the *LWV* court have provided any reason for offense at this. *See League of Women Voters*, 835 F. Supp. 3d at 108–11.

to hold that this tenuous tort can support standing by even the strongest analogy.

Even if the Court decides that breach of confidence can support standing in some circumstances, it cannot do so here. The tort can be generically described as "the unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship." *Id.* at 932 (quotation omitted). And "breach of confidence claims traditionally arise in the context of close professional relationships—those involving physicians, therapists, financial institutions, and the like." *Id.* at 932 (listing cases).

No close professional relationship exists here, so Intervenors are making a strained analogy to a tort whose usefulness for standing is dubious to begin with. Even if another form of "confidential relationship" might suffice, no such relationship exists between Defendants—a public law enforcement agency and its officers—and persons who are subjects of SAVE inquiries.

And even if a confidential relationship existed in some circumstances, none of the information here would be "learned within" it. The only situations where an individual provides information to

Defendants that makes its way into a SAVE record is when a person applies for public benefits or has a law enforcement encounter with DHS. *See League of Women Voters*, No. 25-cv-3501, ECF 37, at 5–6 (D.D.C. Oct. 22, 2025), (explaining that Defendants typically lack information from individuals "who had never had an encounter with DHS"). Neither situation is a "confidential" matter; the public has legitimate interests in both.

Finally, the disclosures here are all privileged because they are between government entities performing a mutual law enforcement purpose. *Washington v. Miami-Dade Cty.*, No. 19-cv-20092, 2019 WL 7049931, at *3 (S.D. Fla. Dec. 23, 2019) (communications between entities with a mutual purpose, especially a law enforcement purpose, are privileged from tort liability). The Plaintiff States seek and use the information, and Defendants disclose it, for the sole purpose of enabling the Plaintiff States to ensure compliance with federal and state citizenship-related laws.

In short, Intervenors' analogy to breach of confidence fails because that obscure tort cannot serve as an analogical predicate for standing

and, even if it could, all of its elements are missing here. *See Drazen*, 74 F.4th at 1343.

*Third*, Intervenors' analogy to defamation likewise fails. "Publication is 'essential to liability' in a suit for defamation." *TransUnion LLC*, 594 U.S. at 434 (quoting Restatement of Torts § 577, Comment *a*, at 192). "The intragovernmental dissemination of information, however, does not meet the publication prong," as courts in this circuit have repeatedly held. *Washington*, 2019 WL 7049931, at *3; *Diaz v. Miami-Dade Cty.*, 424 F. Supp. 3d 1345, 1364 (S.D. Fla. 2019), *aff'd,* 849 F. App'x 787 (11th Cir. 2021) (same); *Cendan v. Sch. Bd. of Broward Cty., Fla.*, 628 F. Supp. 3d 1191, 1209 (S.D. Fla. 2022) (same). Because Defendants' only alleged "publications" here are intragovernmental (from a federal to a state government entity), they cannot support Intervenors' standing by analogy to defamation.

The privileged nature of the communications here also defeats the analogy because defamation "requires the *unprivileged* publication" of information. *Washington*, 2019 WL 7049931, at *3; *Diaz*, 424 F. Supp. 3d at 1364 (same); *Cendan*, 628 F. Supp. 3d at 1219–20 (same). The communications here are privileged because the parties to them "have

mutuality of purpose" to ensure compliance with law. *Washington*, 2019 WL 7049931, at *3; *see also Mack v. Delta Air Lines, Inc.*, 639 F. App'x 582, 586 (11th Cir. 2016) ("no publication arises from . . . communication between corporations that are engaged in a joint enterprise"); *TransUnion LLC*, 594 U.S. at 434 n.6 (citing *Mack* for what counts as defamatory "publication"). Indeed, "the law enforcement context" is a quintessential example of where this mutual-purpose privilege applies. *Washington*, 2019 WL 7049931, at *3.

Any attempt by Intervenors to analogize their alleged privacy and reputational harms to common law torts fails for multiple reasons. Accordingly, these alleged harms cannot give them standing.

*2. Intervenors' alleged "voting" injuries lack traceability and redressability.*

As for the voting-related injuries Intervenors alleged in *LWV*, those purported injuries are neither traceable to Defendants here nor redressable by relief directed at them. As provided by SAVE's standard template agreement, States must provide additional verification for any voter that does not verify as a U.S. citizen on initial verification, afford notice and hearing or other due process available under State or other applicable law before any removal from a voter roll, and comply with all

other federal and state laws. Any burden on a voter's franchise is thus imposed by a State that seeks such additional verification and, finding it lacking, revokes that individual's voter registration under state law procedures. Any harm is therefore traceable to and redressable by States only, not Defendants.

The *LWV* court mistakenly rejected this argument. As for traceability, the court reasoned that "Article III 'requires no more than *de facto* causality,'" and is satisfied when "'third parties will likely react' . . . 'in predictable ways' that will likely cause" the alleged injury. *League of Women Voters*, 835 F. Supp. 3d at 116 (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) & *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025)). The court also asserted that a State's request for "additional verification is itself an Article III injury." *Id.* Because operation of modified SAVE would likely erroneously prompt States to request additional verification and cancel voter registrations, the court reasoned, traceability was satisfied. *Id.*

But here, operation of modified SAVE (and unmodified SAVE) is not even a de facto cause of any Plaintiff State contacting any individual for confirmation of citizenship status or wrongfully cancelling anyone's

voter registration. Modified SAVE is not the cause, but the result, of Plaintiff States and other State SAVE users seeking to confirm individuals' citizenship, something they would attempt to do regardless of whether modified SAVE is an available means of confirmation. If the Plaintiff States did not have access to modified SAVE, then they would still seek verification by unmodified SAVE or other means, and contact individuals for whom SAVE does not produce a citizenship match. In fact, Plaintiff States would contact individuals *more frequently* because SAVE in its unmodified form lacks access to the SSA records that are the sole source of modified SAVE's current ability to confirm for the Plaintiff States that many of their registered voters who lack DHS records are in fact citizens. So the alleged harm of States contacting individuals for confirmation of citizenship is not traceable to Defendants' operation of SAVE.

For similar reasons, the alleged harm of wrongful voter registration cancellation is not traceable to Defendants either. SAVE either confirms that someone is a citizen or it does not. If it does, the user State will not cancel the individual's voter registration. If it does not, the State will seek verification by other means, just as it would without SAVE, and then

cancel that individual's voter registration only if those other means also indicate that the individual is not a citizen, just as the State would without SAVE. Only the accuracy of those alternative means of verification determines the likelihood that a voter registration will be cancelled.[7]

Relatedly, the *LWV* court was wrong to conclude that the alleged harms were redressable by ordering the Defendants here and other federal entities to hamstring modified SAVE because, that court reasoned, doing so would prevent "future harms from 'potential errors'" from SAVE. *League of Women Voters*, 835 F. Supp. 3d at 116 (quoting *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014)).[8] In fact, granting the relief Intervenors request here—reversal of the district court's enforcement order resulting in the Plaintiff States' loss of access

---

[7] Additionally, Intervenors produced no evidence in the *LWV* case that wrongful cancellation of a voter registration by a Plaintiff State is at all likely.

[8] The case that the *LWV* court quoted from, *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335 (11th Cir. 2014), underscores that the alleged harms here are traceable to States, not the federal government. *Arcia* held that alleged wrongful removal from Florida's voter rolls based on results of SAVE inquiries was traceable to and redressable by the *Florida Secretary of State*, not any federal entity or official, whereas the Defendants in this case are all federal entities and officials.

to modified SAVE—would exacerbate rather than relieve Intervenors' alleged "voting" harms.

As mentioned above, reducing SAVE's capabilities as Intervenors ask would result in *more* instances of States seeking citizenship verification by means other than SAVE. Again, Plaintiff States will *more frequently* seek to verify individuals' citizenship independent of SAVE if they lose access to modified SAVE. That is because Plaintiff States frequently begin their attempts to confirm an individual's citizenship with a SAVE inquiry and end it there when SAVE confirms that a person is a citizen. But if Defendants revert SAVE to its unmodified form, it will have access to fewer citizenship records and thus confirm citizenship in fewer cases, causing Plaintiff States to continue their inquiries by other means. This reduction in SAVE citizenship confirmations would also make Plaintiff States *more likely* to be unable to confirm citizenship and thus *increase* any risk that a Plaintiff State might wrongly conclude that an individual is a non-citizen and erroneously cancel that individual's voter registration. So the harms Intervenors allege are not redressable by the relief they seek; that relief would make their alleged harms *worse*.

Succinctly stated, because States can and will seek verification of any subset of their registered voters and act on the results under state law, without any federal involvement, and because a SAVE response itself cannot change a voter's registration status, Intervenors' asserted voting injuries are neither traceable to nor redressable by Defendants. Even if this Court were to vacate the district court's enforcement order, no member of Intervenors whose registration was revoked by a State would be reinstated.[9]

## CONCLUSION

For the foregoing reasons, the Court should dismiss the appeal for lack of standing.

[9] Intervenors do not claim to have any members living in the Plaintiff State of Ohio thus potentially harmed by Ohio's access to modified SAVE. *See* Init. Br. 26 n.5. This is yet another reason why Intervenors lack standing to challenge the enforcement order's grant of relief to the State of Ohio and Ohio Secretary of State.

Respectfully submitted.

JAMES UTHMEIER
*Attorney General*

RYAN NEWMAN
*Chief Deputy Attorney General*

DAVID M.S. DEWHIRST
*Solicitor General*

JASON J. MUEHLHOFF
*Chief Deputy Solicitor General*

*/s/ Christopher J. Baum*
CHRISTOPHER J. BAUM, B.C.S.
*Senior Deputy Solicitor General*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, Florida 32399-1050
(850) 414-3300
christopher.baum@myfloridalega
l.com

*Counsel for Plaintiffs-Appellees State of Florida and the Florida Department of State*

*/s/ Nicholas A. Cordova*
NICHOLAS A. CORDOVA
Boyden Gray PLLC
800 Connecticut Ave NW,
Suite 900
Washington, DC 20006
202-955-0620
ncordova@boydengray.com

*Counsel for Plaintiffs-Appellees State of Ohio and Frank LaRose in his official capacity as Ohio Secretary of State*

BRENNA BIRD
*Attorney General of Iowa*

*/s/ Patrick Valencia*
ERIC H. WESSAN
*Solicitor General*
PATRICK C. VALENCIA
*Deputy Solicitor General*
ANGELA STUEDEMANN
*Assistant Attorney General*
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
Eric.wessan@ag.iowa.gov
Patrick.valencia@ag.iowa.gov
Angela.stuedemann@ag.iowa.gov

*Counsel for Plaintiffs Brenna Bird and Paul Pate*

*/s/ Blake E. Lanning*
BLAKE E. LANNING
Assistant Chief Deputy
Attorney No. 35282-24
Office of the Indiana Attorney General
302 W. Washington St., IGCS – 5th Floor
Indianapolis, IN 46204-2770
Telephone: (317) 232-1146
Fax: (317) 232-7979
Email:
Blake.Lanning@atg.in.gov

*Counsel for State of Indiana*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Christopher J. Baum*
Christopher J. Baum

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2026, I electronically filed the foregoing response with the Clerk of Court by using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Christopher J. Baum*
Christopher J. Baum